ANNE LUTZ *v.* STATE OF MARYLAND.

EDWARD SIEGERT, *v.* STATE OF MARYLAND.

[Nos. 7, 8, April Term, 1934.]

*Decided April 26th, 1934.*

The causes were argued together before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE and SLOAN, JJ.

*Robert Moss,* for the appellants.

*G. C. A. Anderson, Assistant Attorney General,* with whom were *William Preston Lane, Jr., Attorney General,* and *A.Theodore Brady, States Attorney for Anne Arundel County,* on the briefs, for the State.

OFFUTT, J., delivered the opinion of the Court.

The defendant in each of these two cases was indicted, tried, convicted, and sentenced in the Circuit Court for Anne Arundel County for keeping and maintaining a bawdy house.

The indictment filed in each case contained two counts, the first for maintaining a bawdy house, the second for

maintaining a disorderly house, and the two counts of the indictment in the one case are, except for the names, and that the first count in the case against Siegert does not conclude against the statute, identical in form and substance.

A demurrer to the indictment in Siegert's case was overruled, as was a demurrer to each count of the indictment in the case against Anne Lutz. Her case was tried before the court sitting as a jury, while the case against Siegert was tried by a jury. Siegert was convicted under the first count of the indictment, and in the Lutz case there was a general verdict of guilty.

The sole question raised by the appeals is whether either count of the indictment against Lutz, or the first count of the indictment against Siegert, stated an indictable offense. The two cases, while separate and distinct, may therefore be considered together.

Prior to 1890 the offense of keeping a disorderly house was a common law misdemeanor, as prior to 1892 was the offense of keeping a bawdy house, and in each case the punishment was in the discretion of the court. *Beard v. State,* 74 Md. 132, 21 A. 700. Chapter 523 of the Acts of 1890 fixed the punishment for keeping a disorderly house, and chapter 522 of the Acts of 1892 fixed the punishment for keeping a bawdy house. Neither statute defined the offenses to which they respectively related, but left them as at common law.

The law was in that state when the present statute, chapter 737 of the Acts of 1920, codified as Code, art. 27, secs. 20, 21 and 22, was adopted. That statute repealed and re-enacted with amendments section 20, then codified as Code, art. 27, sec. 19, and added two additional sections to that article, which are at present codified as sections 21 and 22, the whole described in its title as relating to "Prostitution, Lewdness and Assignation."

The point of the demurrer to the first count of each of the indictments involved in these appeals apparently is that the statute repealed and superseded the common law offense of keeping a bawdy house, and that the count,

while good at common law, fails to state a violation of the statute, and that, since the common law relating to the maintenance of a bawdy house has been repealed, it states no indictable offense.

In *Hooper v. Baltimore,* 12 Md. 475, it was said: "In Dwarris on Statutes it is said, at page 695, 'As a rule of exposition, statutes are to be construed in reference to the principles of the common law. For it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the act did not intend to make any alteration other than what is specified, and besides what has been plainly pronounced.'" That statement of the law was approved in *Keech v. Baltimore & Washington R. Co.,* 17 Md. 45, and *Greenwood v. Greenwood,* 28 Md. 386, and announces an established rule of statutory construction. *Harrison v. State,* 22 Md. 468; *Heiskell v. Baltimore,* 65 Md. 125, 4 A. 116; 12 *C. J.* 186; 25 *R. C. L.* 1054; *Sutherland on Stat. Construction,* secs. 251, 294.

In 25 *R. C. L.* 1054, it is said that: "It has been said that statutes are not presumed to make any alterations in the common law further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law. The rules of the common law are not to be changed by doubtful implication, nor overturned except by clear and unambiguous language. In order to hold that a statute has abrogated common law rights existing at the date of its enactment, it must clearly appear that they are repugnant to the act, or the part thereof invoked, that their survival would in effect deprive it of its efficacy and render its provisions nugatory."

Where, however, a statute and the common law are in conflict, the common law yields to the statute to the extent of the inconsistency (*Sutherland on Stat. Const.* sec. 294; 12 C. J. 186), and a statute which deals with an entire subject-matter is generally construed as abrogating the common law as to that subject.

Prior to the act of 1920, there was in this state no statutory definition of the kind of offensive nuisance of which a bawdy house is a type (*Beard v. State,* 74 Md. 132, 21 A. 700), so that the question here is whether that statute was so far inconsistent with the common law definition of a bawdy house as to repeal it, or whether the Legislature intended by that statute to deal with all nuisances of that character; for in either event the effect of it would be to supersede the common law as to that particular nuisance. Comparing the statute with the common law definition of a bawdy house, it appears that an essential ingredient of the offense defined by the statute is the "offering or receiving of the body for sexual intercourse for hire" (Code, art. 27, sec. 21) while, at common law, to constitute a bawdy house "it need not be kept for lucre." Bishop on Cr. Law (9th Ed.) sec. 1086. At common law a necessary element of the offense of keeping a bawdy house was that of "keeping," that is, of maintaining, some place, whether a house, a boat, a tent, or a vehicle, kept open to the public for licentious commerce (*Id.,* sec. 1083) but under the statute mere solicitation, or mere entrance into any "place, structure or building" for the purpose "of prostitution, lewdness or assignation," or engaging "in prostitution, lewdness or assignation by any means whatsoever," may constitute an indictable offense. And while at common law only the person or persons who maintained a place open to the public for licentious commerce were indictable for keeping a bawdy house, under the statute any person who occupies such a place or who enters therein for the purpose of engaging in such commerce commits an indictable offense.

It is also apparent, from a comparison of the statute and the common law relating to keeping a bawdy house, that they were directed to different objects, in that while the common law dealt with a specific nuisance, that of maintaining a blatant and noisome establishment for licentious commerce, irrespective of whether such commerce involved hire or payment (*Id.; Wharton on Crimes,* sec. 1728), the statute is directed to the suppression of

sexual vice and perversion practiced for gain, and condemns equally those employed in connection with the commerce, the patrons of the establishment used therefor, and the keeper thereof.

Since it will not be presumed that it was the intention of the Legislature to remove the protection of public decency and morality extended by the common law, without furnishing some adequate substitute therefor, and since the statute neither deals with a bawdy house by that name, nor proscribes the keeping or maintenance of such a place except where it is kept for offering "sexual intercourse for hire," and would permit them when not kept for that specific purpose, it will be presumed that it was not the legislative intent to repeal the common law definition of a bawdy house or the common law offense of keeping such a place. And in repealing Code, art. 27, sec. 20 (then section 19), which fixed the punishment for keeping a bawdy house, chapter 737 of the Acts of 1920 revived the common law as to that. 12 *C. J.* 187, *Sunderland on Stat. Construct.* 573. Since there is therefore no conflict between the common law and the statute, both prevail.

It follows that, as the first count of each indictment describes an offense cognizable at common law, and since that law as to that offense has not been repealed, and since each count concludes "against the peace, government and dignity of the state," the demurrers to them were properly overruled. The additional allegation in the Lutz case that the offense charged was against the form of the statute may be disregarded as surplusage.

The second count of each indictment states in conventional form the common law offense of keeping a disorderly house, and since the only statute relating to that offense deals with the punishment therefor and not with the definition thereof (Code, art. 27, sec. 122; *Beard v. State,* supra), the demurrers as to them were also properly overruled.

On July 6th, 1933, this court rescinded, and re-adopted with amendments, rule 25 of its rules relating to appeals.

As amended, section 2 of the rule is as follows: "When there are no bills of exceptions the transcript of the record shall. be transmitted to this Court within thirty days after the entry of the appeal or suing out of the writ of error." After its adoption the rule was on July 12th and 13th conspicuously displayed in the Daily Record, a daily law journal having a circulation among the profession throughout the state, was referred to in a news item in the Baltimore Sun, a newspaper having a state-wide circulation, and a copy of the rule was sent to the clerk of each court of record in the state. It was also incorporated in the new edition of the rules of this court published and circulated by the Daily Record. The effect of the amendment was to shorten the time for the transmission of records to this court in criminal appeals.

In view of that publicity, and having in mind the obligation upon practicing members of the bar to ascertain the rules of the several courts before which they practice, it must be assumed that attorneys practicing before this court either knew of that change in the rule or were chargeable with notice thereof.

The purpose of the rule was to expedite within reasonable limits the hearing and determination of appeals in criminal cases. The time allowed was, after mature and careful deliberation, considered ample for the adequate preparation of the record. The direction is mandatory and explicit, and, where the record is not transmitted within the time prescribed by it, leaves no room for the exercise of judicial discretion. And where the record is not transmitted within that time the appeal will on proper motion, or may without any motion, be dismissed.

In the Lutz case the appeal was taken on October 31st, 1933, and the record transmitted on January 23rd, 1934, and in the Siegert case the appeal was taken on November 9th, 1933, and the record transmitted on January 23rd, 1934. Had there been a proper motion, both appeals would, for the reasons stated, have been dismissed. There was, however, no motion to dismiss filed in either case within the time limited for such motions by rule 47, and

while the failure to file such a motion within that time would not prevent this court from dismissing the appeals on its own motion, yet, because of the public interest involved in the questions raised by the appeals, we have concluded that that privilege should not be exercised in these cases, and the judgment in each case will be affirmed.

> *Judgment in No. 7 and judgment in No. 8 of the April Term of this court affirmed, with costs.*